**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| TIFFANY TRAVIS, individually and on behalf of those similarly situated,<br><br>                   Plaintiff,<br><br>     v.<br><br>PROCTER & GAMBLE COMPANY; KENVUE, INC.; MCNEIL CONSUMER HEALTHCARE; RECKITT & BENCKISER LLC; and GLAXOSMITHKLINE, LLC,<br><br>                   Defendants. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Tiffany Travis ("Plaintiff"), brings this action individually and on behalf of all others similarly situated, upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters based on the investigation of counsel, and alleges as follows:

**INTRODUCTION**

1.    This case arises from the putative class members' purchase of ineffective over-the-counter ("OTC") medications that were manufactured, promoted, marketed, distributed and sold as providing nasal decongestant effects when the active ingredient in those medications, phenylephrine ("PE") has failed to demonstrate any pharmacological benefit to treat that symptom beyond what would be offered by a placebo when administered orally. PE's ineffectiveness when used orally to treat nasal congestion has long been known in the pharmaceutical industry, but in pursuit of profit to treat the large cold and flu market in the

1

United States, the Defendants chose to mislead consumers instead of following the science. Plaintiff seeks to hold the Defendants responsible for their years long fraudulent marketing practices that have duped patients throughout the United States into believing that they could receive relief from nasal congestion by consuming Defendants' products.

2.     The case involves some of the most well-known consumer brands in the OTC medication market including Advil, Tylenol, Dayquil, Nyquil, TheraFlu, Sudafed, and many others. Throughout this Complaint, the Defendants' OTC products containing orally administered PE as the active ingredient to provide nasal decongestant effects shall be referred to as the "Ineffective Decongestant Products." Plaintiff seeks damages and equitable relief, individually and on behalf of other class members, for Defendants' sale of products that purported to act as decongestants but in fact did not. Defendants were aware that the products were ineffective but marketed them as effective and sold them anyway. Defendants must be held accountable for their long-standing and repeated breach of warranty, deception, fraud, and violation of consumer protection statutes.

**PARTIES**

**A.     Plaintiff**

3.     Plaintiff Tiffany Travis is a citizen and resident of Okaloosa County, Florida. During the relevant time period, Plaintiff Travis purchased  Sudafed, Mucinex, Claritin Theraflu, NyQuil, and Robitussin with the expectation that she would receive relief from her symptoms of nasal congestion. She has taken these Ineffective Decongestant Products daily for several years. Plaintiff paid money for Defendants' Ineffective Decongestant Products and had she known that PE would not provide the nasal decongestant effects promised by the Defendants she would not have purchased the Ineffective Decongestant Products and would

have sought to purchase other products that contain active ingredients that have shown a clinical effect on reducing nasal congestion. She seeks to represent herself and the Nationwide and Florida Classes defined below.

**B.    Defendants**

4.      Defendant The Procter & Gamble Company ("P&G") is an Ohio corporation with its principal place of business and headquarters located at One Procter & Gamble Plaza in Cincinnati, Ohio.  At all times material to this case, P&G has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. P&G markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Vicks, Dayquil, Nyquil, and Flu Therapy brands.

5.      Defendant Kenvue Inc. ("Kenvue") is an American consumer health company and formerly the consumer division of Johnson & Johnson ("J&J"). Kenvue is headquartered in New Jersey. At all relevant times Kenvue and its predecessor J&J has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. Kenvue, and previously J&J, markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Sudafed PE and Benadryl brands.

6.      Defendant McNeil Consumer Healthcare ("McNeil") is a wholly owned subsidiary of Kenvue with headquarters in Pennsylvania. At all times material to this case, McNeil has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. McNeil markets, promotes, and distributes Ineffective

Decongestive Products containing PE through the Tylenol Cold + Flu brand.

7.    Defendants Reckitt & Benckiser LLC ("Reckitt") is a Delaware limited liability corporation with its headquarters and principal place of business located in Parsippany, New Jersey. At all times material to this case, Reckitt has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. Reckitt markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Mucinex brand.

8.    Defendant GlaxoSmithKline LLC ("GSK") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. At all times material to this case, GSK has been engaged in the manufacturing, sale, and distribution of OTC medications containing PE that have been falsely marketed as providing nasal decongestant relief when in fact PE provides no such relief. GSK markets, promotes, and distributes Ineffective Decongestive Products containing PE through the Theraflu, Advil, and Robitussin brands.

9.    P&G, Kenvue, Reckitt, and GSK shall be collectively referred to throughout the Complaint when appropriate as "Defendants."

## JURISDICTION AND VENUE

10.    This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from that of each Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed class consists of more than 100 class members, and (d) none of the exceptions under the subsection apply to this action.

11.    This Court has personal jurisdiction over Defendants because each Defendant

has sufficient minimum contacts in this State, and because each Defendant has otherwise intentionally availed itself of the markets within this State through their business activities, such that the exercise of jurisdiction by this Court is proper and necessary.

12.    Venue is proper in this District because the claims alleged in this action accrued in this District and each Defendant regularly transacts its affairs in this District.

13.    Each Defendant is subject to the personal jurisdiction of this Court because the Defendants conduct business within this State, maintain and carry out continuous and systematic contacts within this State and this judicial District, regularly transacts business within this State and this judicial District, and regularly avails themselves of the benefits of their presence in this State and this judicial District.

## FACTUAL ALLEGATIONS

**A.    The Big Business Of Nasal Decongestants.**

14.    The market for drugs purported to relieve congestion is over $2 billion per year and includes at least 250 products.

15.    One of the two leading ingredients, only phenylephrine ("PE") is sold over-the-counter ("OTC"). The other leading ingredient, pseudoephedrine, is effective but is usually sold behind the counter from locked containers, and consumers are limited in the number they can buy. As a result, PE drugs are more popular and account for approximately 80% of the $2 billion annual market.

16.    These medicines are most often used to treat the common cold. According to the American Lung Association, approximately 200 different viruses can cause cold like symptoms which often leads to runny nose, congestion, and sneezing.

17.    In the United States, colds account for more visits to the doctor than any other

single condition. Adults get an average of two to four colds per year, mostly between September and May. In the United States it is estimated that people in the United States suffer 1 billion colds annually.

18.    There are no antiviral medications available for treating the common cold and instead the vast majority of patients rely on products to provide symptom relief. OTC medications are a common form patients seek to receive symptom relief for the common cold.

19.    This stunning demand has caused companies to leverage the OTC space in order to provide ostensible symptom relief for the millions of Americans suffering this common ailment.

20.    When OTC medications containing pseudoephedrine began receiving added regulatory scrutiny due to their propensity to make it into the illegal drug market, companies began marketing efforts to drive consumers to products containing PE.

21.    PE and pseudoephedrine have different mechanisms of action. PE is a specific alpha-1 adrenergic receptor agonist that works by temporarily constricting blood vessels. By contrast, pseudoephedrine is a relatively less selective agonist that acts on both alpha and beta-adrenergic receptors. It is more lipophilic than PE, and more accessible to the central nervous system because it crosses the blood-brain barrier. As a result, pseudoephedrine taken orally does not metabolize at the same rate as PE, making it more bioavailable than orally-administered PE. Defendants are well aware of the mechanisms of action between pseudoephedrine and PE and the different metabolic rates for each ingredient.

**B.    Defendants Marketed OTC Medications Containing PE As A Decongestant.**

22.    P&G markets the following OTC medications as decongestants: Vicks Nyquil

Severe Cold and Flu, Vicks NyQuil Sinex, Vicks Dayquil Severe Cold and Flu, Vicks Sinex Severe, Vicks Flu Therapy Night Severe Cold and Flu. On its website, P&G makes the following representations regarding PE:

**Vicks Products for Nasal Congestion Relief**

Nasal congestion, also known as stuffy nose, is when the lining of the nasal cavity becomes inflamed and swollen, which can cause mucus to build up. Nasal congestion is typically caused by one of two things—a viral infection (like a cold or flu) or allergies (often triggered by dust, pet dander, and more). Learn more about nasal congestion.

To relieve your nasal congestion symptoms, look for an OTC medicine with a decongestant like Phenylephrine or Oxymetazoline. Decongestants constrict enlarged blood vessels to shrink the swollen nasal tissues causing your stuffy nose. The ingredients label on the back of Vicks products will give the name of the active ingredient, and identify what type of active ingredient it is, to help clear up any confusion on the shelf.

23.    P&G's product packages all indicate that PE provides decongestant relief. As an example, here is the product packaging for Dayquil Severe Cold and Flu:



24.    Kenvue, formerly J&J, and McNeil through their consumer brands market the following OTC medications as decongestants: Sudafed PE, Benadryl Allergy Plus Congestion, and Tylenol Cold + Flu. On its website for Sudafed PE, Kenvue makes the following representations:




25.     GSK markets the following OTC medications as decongestants: Advil Sinus Congestion and Pain, and Robitussin. On its website, GSK makes the following representations:



26.     PE is listed as the active ingredient providing the "decongestant" effect marketed in all of these products.

27.     Each Defendant makes similar claims that PE works as the active nasal decongestant ingredients in these numerous consumer brands. Each Defendant promises that these products contain active ingredients that will relieve the symptoms of nasal congestion, and expects consumers to rely upon these promises,

28.     Defendants know that consumers look for decongestant relief when searching for an OTC medication to provide symptom relief for the common cold and other ailments and

illnesses causing nasal congestion. They directly market their products as providing this relief. "Nasal congestion" is often the first symptom listed on the product packaging that these OTC medications treat. Defendants do this because they know when suffering from cold, flu, and other similar ailments, nasal congestion is one of the key symptoms consumers of these OTC medications seek to relieve.

### C.    PE Is Not A Decongestant When Administered Orally.

29.    Unfortunately for consumers (but known to Defendants), PE does not work when taken orally to relieve congestion. This is because once metabolized by the stomach the bioavailable amount of PE available is around 1%, an insufficient amount to actually result in a pharmacological effect.

30.    Recently the Nonprescription Drug Advisory Committee to the FDA ("NDAC") conducted a meta-review of the original data used by the FDA to approve PE as a nasal decongestant and the data from studies conducted after the initial FDA review. The conclusion of the NDAC could not be more clear: PE when used orally does not work as a decongestant. Specifically, the NDAC found:

As a result of our evaluation, we believe that the new efficacy data far outweigh the data provided to the Agency as part of the original Panel review. These results suggest that: 1) oral PE at monographed dosages is not effective as a decongestant (i.e., in the face of the new data, the original data are likely not sufficient to support a GRASE determination), 2) oral doses up to 40 mg would also not be effective, 3) finding an effective oral dose that is also safe is not feasible (meaning that doses higher than 40 mg would need to be explored but would also not be safe to study due to effects on blood pressure), and 4) an appropriate dosing interval for oral PE has not been established (meaning that, based on the PK data, an every-4-hour dosing interval is likely too long). Therefore, in addition to lack of efficacy, there may be no path to evaluating higher doses of oral PE as a nasal decongestant.

31.    The NDAC reached this conclusion through an exhaustive review of the available studies including studies from 2015-2017 showing that PE when taken orally at the dosages

available in OTC medications resulted in no greater effect on decongestants than a placebo. The NDAC Briefing Document published on September 11, 2023 on the oral efficacy of PE as a decongestant is attached as **Exhibit A**.

32.     The FDA is now considering banning PE from oral medication, which would result in pulling hundreds of products containing PE from shelves. Since the FDA panel's conclusion came out, prices for oral medication containing PE have plummeted and consumers are looking elsewhere for the decongestant relief Defendants promised PE would deliver.

**D.    Defendants Knew PE Is Not Effective As A Decongestant.**

33.     Defendants are large corporations with dedicated units devoted to reviewing and commenting on studies that affect their products.

34.     As a result, Defendants knew of the studies cited by the NDAC and specifically were aware of the studies from 2015-present that demonstrate PE is not an effective decongestant.

35.     Nevertheless, Defendants continued to promote to the public that OTC medications containing PE and that would be administered orally were effective as a "decongestant."

**E.    Plaintiff Is Entitled To Tolling Of All Applicable Statute of Limitations.**

36.     Plaintiff and the other Class members had no way of knowing about Defendants' deception concerning their PE drugs. As consumers, they reasonably believed that the products offered for sale as decongestants were capable of acting as decongestants. Within the time period of any applicable statutes of limitations, Plaintiff and the other Class members could not have discovered through the exercise of reasonable diligence that Defendants' decongestant products were ineffective.

37.     Plaintiff and the other Class members did not discover and did not know facts that

would have caused a reasonable person to suspect that Defendants did not report information within their knowledge about the ineffectiveness of their decongestant products; nor would a reasonable and diligent investigation have disclosed that Defendants had concealed such information about the products' efficacy, which was only known by Plaintiff and the other Class members after the FDA decision in September 2023. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule for the claims asserted herein.

38.    All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time-period relevant to this action. Rather than disclose the truth about their Ineffective Decongestant Products, Defendants falsely represented these products as ones that would relieve congestion.

39.    Defendants were under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of their Ineffective Decongestant Products. Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of their Ineffective Decongestant Products. As a result, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**CLASS ALLEGATIONS**

40.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated. Plaintiff seeks to represent the following Classes:

> All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant Procter & Gamble in the United States (the "P&G Nationwide Class").

> All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant Kenvue and its predecessor J&J in the United States

(the "Kenvue Nationwide Class").

All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant Reckitt and its predecessor J&J in the United States (the "Reckitt Nationwide Class").

All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant McNeil in the United States (the "McNeil Nationwide Class").

All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant GSK in the United States (the "GSK Nationwide Class").

All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant Procter & Gamble in the State of Florida (the "P&G Florida Class").

All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant Kenvue and its predecessor J&J in State of Florida (the "Kenvue Florida Class").

All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant Reckitt and its predecessor J&J in the State of Florida (the "Reckitt Florida Class").

All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant McNeil in the State of Florida (the "McNeil Florida Class").

All persons who purchased an oral nasal decongestant containing phenylephrine manufactured by Defendant GSK in the State of Florida (the "GSK Florida Class").

41.    Excluded from the Classes are the Defendants, and any of the Defendants' members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation. This action has been brought and may properly be maintained on behalf

of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

42.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

43.     **Numerosity**: Rule 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Plaintiff is informed and believes that there are hundreds of thousands of members of the Classes based on the size of the market for decongestant products and Defendants' share of that market, but the precise number of Class members is unknown to Plaintiff.

44.     **Commonality and Predominance**: Rule 23(a)(2) and (b)(3): This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation: a) when Defendants knew that phenylephrine was ineffective as a decongestant; b) whether Defendants sold decongestant products as effective; c) what measures Defendants took to conceal the true nature of their Ineffective Decongestant Products; d) Defendants' duty to disclose the true nature of their Ineffective Decongestant Products; e) whether Plaintiff and the other Class members overpaid for Defendants' Ineffective Decongestant Products; and f) whether Plaintiff and the other Class members are entitled to equitable and injunctive relief.

45.     **Typicality**: Rule 23(a)(3): Plaintiff's claims are typical of the other Class Members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above. Plaintiff suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged.

46.     **Adequacy**: Rule 23(a)(4): Plaintiff is an adequate Class Representatives because her interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the Class's interests.

47.     **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in managing this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the members of the Classes to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, such litigation creates a potential for inconsistent or contradictory judgments. It increases the delay and expense to all parties and the court system. By contrast, a class action is suited and intended to manage such difficulties and provide the benefits of uniform and common adjudication, economy of scale, and comprehensive supervision.

48.     **Declaratory Relief**: Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making declaratory relief appropriate, with respect to each Class as a whole.

## CLAIMS

### COUNT I
### *BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY*
### (Against All Defendants)

49.     Plaintiff repeats and realleges the foregoing as if fully set forth herein.

50.     Plaintiff brings this claim on behalf of the Nationwide Classes or, in the alternative, the State Classes (the "Class," for purposes of this Count).

51.     Defendants were at all times a "merchant" within the meaning of Article 2 of the U.C.C., as codified under applicable law.

52.     The Ineffective Decongestant Products are and were "goods" within the meaning of Article 2 of the U.C.C., as codified under applicable law.

53.     Defendants were obligated to provide Plaintiff and the other Class members Ineffective Decongestant Products that were of merchantable quality, were reasonably fit for the purpose for which they were sold, and conformed to the standards of the trade.

54.     Defendants impliedly warranted that those drugs were of merchantable quality and fit for that purpose.

55.     Defendants breached their implied warranties, because their Ineffective Decongestant Products were not of merchantable quality or fit for their ordinary purpose.

56.     Defendants' breaches of implied warranties were a direct and proximate cause of Plaintiff's and the other Class members' damages.

## COUNT II
### *FRAUD BY OMISSION OR CONCEALMENT*
**(Against All Defendants)**

57.     Plaintiff repeats and realleges the forgoing as if fully set forth herein.

58.     Plaintiff brings this claim on behalf of the Nationwide Classes or, in the alternative, the State Classes (the "Class," for purposes of this Count).

59.     Defendants intentionally and knowingly falsely concealed, suppressed and/or omitted material facts including as to the standard, quality or grade of the PE Drugs. Due to their fraudulent conduct, Plaintiffs and the other Class members have suffered actual damages.

15

60.     Defendants knew that PE is ineffective at safe dosages when consumed orally.

61.     Defendants were obligated to inform Plaintiff and the other members of the Class of the effectiveness of PE due to their exclusive and superior knowledge of the Ineffective Decongestant Products.

62.     Plaintiff and other Class members also expressly reposed a trust and confidence in Defendants because the nature of their dealings as a healthcare entity and with Plaintiff and other members of the Class as their consumers.

63.     Plaintiff and the other Class members would not have purchased the Ineffective Decongestant Products but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Ineffective Decongestant Products and existence of the Ineffective Decongestant Products, or would have paid less for the Ineffective Decongestant Products.

64.     Defendants knew their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts.

65.     Defendants acted with malice, oppression, and fraud.

66.     Plaintiff and the other Class members reasonably relied on Defendants' knowing, affirmative, and active false concealment and omissions. As a direct and proximate result of Defendants' omissions and active concealment of material facts regarding the Ineffective Decongestant Products, Plaintiff and the other Class members have suffered actual damages in an amount to be determined at trial.

## COUNT III
### *UNJUST ENRICHMENT*
**(Against All Defendants)**

67.     Plaintiff repeats and realleges the foregoing as if fully set forth herein.

68.     Plaintiff brings this claim on behalf of the nationwide Class or, in the alternative,

the State Classes (the "Class," for purposes of this Count).

69.    Defendants' actions include, but are not limited to, providing point-of-sale materials and coupons to entice Plaintiff and the other Class members to purchase Ineffective Decongestant Products.

70.    It would be inequitable for Defendants to insulate themselves from liability on this unjust enrichment claim by asserting that retail sales by their retailers cuts off any relationship between the Plaintiff and the Classes and Defendants because Plaintiff and the other Class members cannot seek a remedy directly from Defendants' retailers based on Defendants' sale of the Ineffective Decongestant Products.

71.    Plaintiff and all other Class members conferred a benefit on Defendants by purchasing Ineffective Decongestant Products.

72.    Defendants have been unjustly enriched in retaining the revenues derived from Class members' purchases of Ineffective Decongestant Products, which retention under these circumstances is unjust and inequitable because Defendants misrepresented that decongestant products were effective for providing congestion relief when in fact they were not, which caused injuries to Plaintiff and all Class members because they paid a price premium due to Defendants' deception.

73.    Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiff and all Class members is unjust and inequitable, Defendants must pay restitution to Plaintiff and the Class members for their unjust enrichment, as ordered by the Court.

**COUNT IV**
***VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT***
***R.C. § 1345.01, et seq.***
**(Against Procter and Gamble)**

74.    Plaintiff repeats and realleges the foregoing as if fully set forth herein.

17

75.    Plaintiff brings this claim individually and on behalf of the P&G Nationwide Classes, or in the alternative, the P&G State Classes as defined above. This claim is asserted solely against P&G.

76.    Plaintiff, the other Class members, and Defendant P&G are each a person within the meaning of R.C. § 1345.01(B).

77.    Sales of the Ineffective Decongestant Products sold by P&G to consumers like Plaintiff and the class are "consumer transactions" within the meaning of R.C. § 1345.01(A).

78.    The Ohio Consumer Sales Practices Act ("OCSPA") makes it unlawful to engage in an "unfair or deceptive act or practice in connection with a consumer transaction." The OCSPA further states that making representations that a product "has sponsorship, approval, performance, characteristics, accessories, uses or benefits that it does not have," or that the product "is of a particular standard, quality, grade, style, prescription, or model, if it is not" constitute an unfair or deceptive act or practice.

79.    As alleged herein, P&G sold the Ineffective Decongestant Products representing that they would relieve nasal congestion despite knowing that PE, the active ingredient meant to provide such relief, was not effective in reducing such a symptom. This had the capacity, tendency, or effect of misleading consumers in violation of the OCSPA. P&G breached its implied warranty in tort, which is an unfair and deceptive act as defined by R.C. 1345.02.(B). Moreover, P&G has committed an unfair and deceptive act by concealing the fact that its products containing PE are ineffective, and in failing to inform Plaintiff and other Class Members of the ineffectiveness of these products.

80.    P&G willfully and knowingly withheld information about the inefficacy of PE to its consumers and put on packaging, website, and other promotion materials that P&G's Ineffective

Decongestant Products could alleviate such symptoms. P&G knew or should have known that PE when administered orally as it is in the Ineffective Decongestant Products had no meaningful pharmacological effect on the nasal passages and would perform no better or worse than a placebo when taking orally to relieve nasal congestion.

81.     P&G's marketing, sale, and promotion of the Ineffective Decongestant Products emanated from its headquarters in Cincinnati, Ohio and were made by executives and marketing teams that work in and out of P&G's corporate headquarters. P&G conducted a national marketing campaign to promote the Ineffective Decongestant Products as effective to relieve nasal congestion from its Cincinnati headquarters and knew that its marketing and promotional activities would have national impact and reach. P&G through its website, product packaging, and national marketing efforts made similar statements about the efficacy of the Ineffective Decongestant Products throughout the United States in order to boost sales of its OTC medications and knew that its unfair and deceptive acts or practices would have the tendency or capacity to mislead and create a false impression in consumers nationally and/or were likely to and did deceive consumers, including Plaintiff and the other members of the putative state and national Classes.

82.     Plaintiff and the other Class members suffered ascertainable loss caused by P&G's sale of the Ineffective Decongestant Products. Had Plaintiff and other members of the Class been aware of the lack of efficacy of the Ineffective Decongestant Products in alleviating nasal congestion, Plaintiff either would have paid less for the Ineffective Decongestant Products or would not have purchased them at all and instead purchase products with known pharmacological effect to treat that symptom. Plaintiff and the other Class members did not receive the benefit of their bargain as a result of P&G's unfair and deceptive acts and practices.

83.     The Ohio Attorney General has made available for public inspection prior state

court decisions which held that the acts and omissions of Defendants as detailed in this Complaint, including, but not limited to, the failure to honor both its implied and express warranties; and the concealment and/or non-disclosure of a substantial defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

        a. *State ex. rel. DeWine v. GlaxoSmithKline LLC* (OPIF #10002956)

        b. *State ex. rel. DeWine v. GlaxoSmithKline LLC* (OPIF #10003046)

84.     Plaintiff, individually and on behalf of the National and State Classes, seeks monetary damages, costs, attorneys' fees, and such other and further relief provided by law and equity and are entitled to the same pursuant to R.C. 1345.09.

**COUNT V**
***VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT***
***N.J.S.A. 56:8-1, et seq.***
**(Against Reckitt and Kenvue)**

85.     Plaintiff repeats and realleges the foregoing as if fully set forth herein.

86.     Plaintiff brings this claim individually and on behalf of the Reckitt and Kenvue Nationwide Classes, or in the alternative, the Reckitt and Kenvue State Classes as defined above. Plaintiff asserts this count strictly against Reckitt and Kenvue.

87.     At all relevant times, the Ineffective Decongestant Products sold by Reckitt and Kenvue at issue constituted "merchandise," as defined by N.J.S.A. 56:8-1(c).

88.     At all relevant times, Reckitt and Kenvue sales and/or distribution of the Ineffective Decongestant Products at issue met the definition of "sale" set forth by N.J.S.A. 56:8-1(e).

89.     N.J.S.A. 56:8-2 provides that "[t]he act, use or employment by any person of any unconscionable practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of material fact with the intent that others rely upon such concealment, suppression or omission, . . . is declared to be an unlawful practice…" As

20

alleged above, Kenvue and Reckitt sold Ineffective Decongestant Products to Plaintiff and each other Class member as products that provide relief for nasal congestion. Yet Kenvue and Reckitt also knew that PE is ineffective to treat that symptom when consumed orally at the dosages sold by Kenvue and Reckitt in the Ineffective Decongestant Products.

90.     Kenvue and Reckitt therefore engaged in practices that are unconscionable, deceptive, and fraudulent and that are based on false pretenses and the knowing concealment, suppression, or omission of material fact with the intent that others rely upon such concealment, suppression or omission in their manufacturing, selling, and distribution of their Decongestant Products. Defendants therefore violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

91.     As alleged herein, Kenvue and Reckitt sold the Ineffective Decongestant Products representing that they would relieve nasal congestion despite knowing that PE, the active ingredient meant to provide such relief, was not effective in reducing such a symptom. This had the capacity, tendency, or effect of misleading consumers in violation of the New Jersey Consumer Fraud Act.

92.     Defendants willfully and knowingly withheld information about the inefficacy of PE to their consumers and put on packaging, website, and other promotion materials that Reckitt's and Kenvue's Ineffective Decongestant Products could alleviate such symptoms. Reckitt and Kenvue knew or should have known that PE when administered orally as it is in the Ineffective Decongestant Products had no meaningful pharmacological effect on the nasal passages and would perform no better or worse than a placebo when taking orally to relieve nasal congestion.

93.     Reckitt's and Kenvue's marketing, sale, and promotion of the Ineffective Decongestant Products emanated from its headquarters in New Jersey and were made by

executives and marketing teams that work in and out of Reckitt's and Kenvue's corporate headquarters. Reckitt and Kenvue conducted a national marketing campaign to promote the Ineffective Decongestant Products as effective to relieve nasal congestion from its New Jersey headquarters and knew that its marketing and promotional activities would have national impact and reach. Reckitt and Kenvue through their websites, product packaging, and national marketing efforts made similar statements about the efficacy of the Ineffective Decongestant Products throughout the United States in order to boost sales of its OTC medications and knew that its unfair and deceptive acts or practices would have the tendency or capacity to mislead and create a false impression in consumers nationally and/or were likely to and did deceive consumers, including Plaintiff and the other members of the putative state and national Classes.

94.      Plaintiff and the other Class members suffered ascertainable loss caused by Reckitt and Kenvue's sale of the Ineffective Decongestant Products. Had Plaintiff and other members of the Class been aware of the lack of efficacy of the Ineffective Decongestant Products in alleviating nasal congestion, Plaintiff either would have paid less for the Ineffective Decongestant Products or would not have purchased them at all and instead purchase products with known pharmacological effect to treat that symptom. Plaintiff and the other Class members did not receive the benefit of their bargain as a result of Reckitt and Kenvue's unfair and deceptive acts and practices.

95.      Plaintiff, individually and on behalf of the National and State Classes, seeks monetary damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## COUNT VI
### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 P.S. §§ 201-1, et seq.

**(Against McNeil and GSK)**

96.    Plaintiff repeats and realleges the foregoing as if fully set forth herein.

97.    Plaintiff brings this claim individually and on behalf of the McNeil and GSK Nationwide Classes, or in the alternative, the McNeil and GSK State Classes as defined above. Plaintiff asserts this count strictly against McNeil and GSK.

98.    At all relevant times, the Ineffective Decongestant Products sold by McNeil and GSK at issue constituted "goods," as used throughout the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "PCPL").

99.    At all relevant times, McNeil and GSK sales and/or distribution of the Ineffective Decongestant Products at issue met the definition of "trade" and commerce set forth by 73 P.S. § 201-2(3).

100.    The PCPL defines an unfair or deceptive act or practice as the following:

(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(ix) Advertising goods or services with intent not to sell them as advertised.

73 P.S. § 201-2(4).

101.    GSK and McNeil therefore engaged in unfair or deceptive acts or practices in their manufacturing, selling, and distributing their Ineffective Decongestant Products. GSK and McNeil

therefore violated the PCPL.

102.    As alleged herein, McNeil sold the Ineffective Decongestant Products representing that they would relieve nasal congestion despite knowing that PE, the active ingredient meant to provide such relief, was not effective in reducing such a symptom. This had the capacity, tendency, or effect of misleading consumers in violation of the Pennsylvania Consumer Fraud Act.

103.    Defendants willfully and knowingly withheld information about the inefficacy of PE to their consumers and put on packaging, website, and other promotion materials that McNeil and GSK's Ineffective Decongestant Products could alleviate such symptoms. McNeil and GSK knew or should have known that PE when administered orally as it is in the Ineffective Decongestant Products had no meaningful pharmacological effect on the nasal passages and would perform no better or worse than a placebo when taking orally to relieve nasal congestion.

104.    McNeil's and GSK's marketing, sale, and promotion of the Ineffective Decongestant Products emanated from its headquarters in Pennsylvania and were made by executives and marketing teams that work in and out of McNeil's and GSK's corporate headquarters. McNeil and GSK conducted a national marketing campaign to promote the Ineffective Decongestant Products as effective to relieve nasal congestion from its Pennsylvania headquarters and knew that its marketing and promotional activities would have national impact and reach. McNeil and GSK through their websites, product packaging, and national marketing efforts made similar statements about the efficacy of the Ineffective Decongestant Products throughout the United States in order to boost sales of its OTC medications and knew that its unfair and deceptive acts or practices would have the tendency or capacity to mislead and create a false impression in consumers nationally and/or were likely to and did deceive consumers, including Plaintiff and the other members of the putative state and national Classes.

105.    Plaintiff and the other Class members suffered ascertainable loss caused by McNeil and GSK's sale of the Ineffective Decongestant Products. Had Plaintiff and other members of the Class been aware of the lack of efficacy of the Ineffective Decongestant Products in alleviating nasal congestion, Plaintiff either would have paid less for the Ineffective Decongestant Products or would not have purchased them at all and instead purchase products with known pharmacological effect to treat that symptom. Plaintiff and the other Class members did not receive the benefit of their bargain as a result of McNeil's and GSK's unfair and deceptive acts and practices.

106.    Plaintiff, individually and on behalf of the National and State Classes, seeks monetary damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## COUNT VII
### *VIOLATION OF THE FLORIDA DECEPTIVE TRADE PRACTICES ACT*
### *Fla. Stat. § 501.201, et seq.*
### (Against All Defendants)

107.    Plaintiff repeats and realleges the foregoing as if fully set forth herein.

108.    Plaintiff brings this claim individually and on behalf of the Nationwide and Florida State Classes. Plaintiff assert this count against all Defendants.

109.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair and deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204(1).

110.    Plaintiff and the Florida Class members are "[c]onsumers" and "[i]nterested part[ies] or person[s]" as defined by FDUTPA. Fla. Stat. §501.203(6)-(7).

111.    Defendants' actions set forth herein occurred while engaging "[t]rade or commerce" as defined by FDUTPA. Fla. Stat. §501.203(8). Defendants' conduct as set forth herein

constitutes unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices under FDUTPA.

112.    As alleged herein, at the time the Defendants sold, marketed, promoted and distributed the Ineffective Decongestant Products in Florida they knew or should have known that PE when administered orally would have no effect beyond placebo in alleviating symptoms of nasal congestion. Defendants unfair and deceptive practices induced Plaintiff and members of the Florida Class to purchase the Ineffective Decongestant Products that they otherwise would not have purchased had Defendants been truthful about PE's ineffectiveness.

113.    Defendants willfully and knowingly withheld information about the inefficacy of PE to their consumers and put on packaging, website, and other promotion materials that Defendant's Ineffective Decongestant Products could alleviate such symptoms. Defendants knew or should have known that PE when administered orally as it is in the Ineffective Decongestant Products had no meaningful pharmacological effect on the nasal passages and would perform no better or worse than a placebo when taking orally to relieve nasal congestion.

114.    Plaintiff and the other Florida Class Members suffered ascertainable loss caused by Defendants' sale of the Ineffective Decongestant Products. Had Plaintiff and other members of the class been aware of the lack of efficacy of the Ineffective Decongestant Products in alleviating nasal congestion, Plaintiff either would have paid less for the Ineffective Decongestant Products or would not have purchased them at all and instead purchase products with known pharmacological effect to treat that symptom. Plaintiff and the other Class members did not receive the benefit of their bargain as a result of Defendants unfair and deceptive acts and practices.

115.    Plaintiff, individually and on behalf of the Florida Classes, seeks monetary damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully request that the Court enter judgement in their favor and against Defendants, as follows:

A.  Certification of the proposed Class with Plaintiff as class representative;

B.  Appointment of Plaintiff's counsel as Class Counsel;

C.  Injunctive relief, including, but not limited to requiring Defendants to make full disclosure of their knowledge of the efficacy of their Ineffective Decongestant Products;

D.  Disgorgement of their profits from the sales of their Ineffective Decongestant Products;

E.  Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

F.  An order requiring Defendants to pay both pre- and post-judgment interest on all amounts awarded;

G.  An award of costs and attorneys' fees; and

H.  Such other further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of those similarly situated, demands a trial by jury on all issues so triable.

Dated: September 25, 2023

Respectfully submitted,

By: */s/ Alyson S. Beridon*
Alyson S. Beridon, Trial Attorney (#87496)
**Herzfeld, Suetholz, Gastel, Leniski**
  **& Wall, PLLC**
600 Vine St., Suite 2720
Cincinnati, OH 45202
Ph: (513) 381-2224
Fax: (615) 994-8625
alyson@hsglawgroup.com

Benjamin A. Gastel* (TN BPR #28699)
Joey Leniski* (TN BPR #22891)
**Herzfeld, Suetholz, Gastel, Leniski**
  **& Wall, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Ph: (615) 800-6225
Fax: (615) 994-8625
ben@hsglawgroup.com
joey@hsglawgroup.com

*Application for admission *pro hac vice* forthcoming